Security, security, security. The United States Court of Appeals for the Eleventh Circuit is now in the Court of the Law. God save the United States and His Honorable Court. Thank you. Please be seated. Welcome to the Eleventh Circuit. We have one case on for today. The case of Darryl Stinski v. the Warden of the Georgia Diagnostic and Classification Prison. Please try to stick to the time limits that you have. If we ask you any questions that take you over the time, of course, please answer those questions. We wouldn't be asking them if we didn't want to hear the answers to them. But other than that, we would appreciate your sticking closely to the times that are allotted. And with that, we will begin with, is it Mr. Fuse? Mr. Fuse. Thank you very much. Good afternoon and may it please the Court. Darryl Stinski was denied the effective assistance of counsel at the sentencing phase of his trial. The state court unreasonably failed to recognize at the habeas level that trial counsel was on notice of the need for additional experts and through neglect failed to follow through on that knowledge. At the habeas level, the state court also unreasonably concluded that otherwise compelling scientific evidence was nonetheless cumulative. The district court failed to properly apply section 2254 D2 of the Anti-Terrorism and Effective Death Penalty Act and instead limited its analysis largely to section E1. That was error and fails to follow what this court held in pie. Those two sections are independent and must be applied independently. The district court did not do that. Under a correct D2 analysis, the state court's determination is unreasonable. I'd like to start with the first prong of the Strickland test, counsel's deficient performance. I want to make sure I understand your argument, the last argument. When you say they must be applied separately and that the district court only applied E and not D, right? Now tell me why you think what the district court did is in tension with pie. Your Honor, this court in pie held that just because you demonstrate that you rebut a fact under E1 based on clear and convincing evidence, that that doesn't necessarily mean that you've established that the overall finding was unreasonable under D2. Here the reverse is presented. What the district court was looking for was a fact found by the state court that was rebutted by clear and convincing evidence as a predicate to finding that the state court's overall determination was unreasonable under D2, and that is our contention. Okay, I think I understand that better now. Thank you. Can I, before you get into that, the certificate of appealability here is on the issue of whether the court properly applied sections 2254-D2 and 2254-E1 of ADPA in the habeas order when evaluating petitioner's ineffective assistance of counsel claim. And I wonder whether if we think that the district court did correctly apply those two sections under pie, do we get to any other issues in this case? Your Honor, I think the court does because there is an independent analysis that needs to be undertaken under D2. And that analysis, this court reviewing what the district court did de novo, would find that it is an unreasonable determination of the facts as a whole. But, and I think you're, you may be right if, well, I don't even know if you're right if the answer is, you might be, if the answer is that the district court improperly applied the two, then would we send it back down to be properly applied after we give the correct standard? Or would we decide it ourselves? And if we conclude that the district court properly applied D2 and E1, would we then get to go any further than that? Do you understand what I'm saying? I do, Your Honor, and maybe if I could answer them in turn. I think both of the alternatives that you presented are viable alternatives. This court could make a determination that what the state court did was unreasonable and end it there. This court could conclude that the district court did not perform the correct analysis and remand it back to the district court with guidance on how to properly apply the D2 standard. So that's the first point. But, Your Honor, the certificate of appealability, if you look at what the judge granted the certificate on, it is on the application of both of those sections to the facts of this case. And it is our contention that the court improperly applied the D2 standard because it made the D2 standard dependent on the E1 analysis, despite this court's holding in Pye and the Supreme Court's holding in the first Miller L decision where the Supreme Court said, similar to what this court said in Pye, that these standards must be applied independently, but more importantly that importing the clear and convincing standard of E1 into D2 is too demanding a standard to force a petitioner to meet. I understand that's your argument, but I think maybe Judge Rosenbaum's question was, if we disagree with that conclusion, are we able to say anything beyond that, given the language of the COA? I think you are, because I think this court can find that D2 was not properly applied. Right, but if we say it was properly applied, then can we, does this court have the authority to do anything beyond that? I'm not asking you to concede that it was. I'm just saying that if we did, would we have room to say anything else, even if we wanted to? Your Honor, I think you have room to correct the error, and that was it. And the court also has room to clarify what's left unsaid in the Pye decision, though clearly suggested by it, which is that you do not need to demonstrate and rebut a fact by clear and convincing evidence under E1 to nonetheless prevail under D2. So I think that's right, provided that the fact is not a material fact to the D2 resolution, right? Would you agree with that? I would agree with that, Your Honor. But if it is a material fact, then you have to do both, right? You have to show, first of all, that you have to be able to prove by clear and convincing evidence that it was incorrectly decided as a factual matter. And then you also have to show that there was an unreasonable decision that accounted for that fact, right? I mean, you have to do both if it's a material fact. Your Honor, maybe we disagree on what a material fact is, but what I would say, Your Honor, is that certainly a petitioner can rebut a finding of fact under E1. It's not obligated to do so to prevail under D2. But importantly, under the D2 analysis, the court has to look at the entirety of the record. And the court cannot simply ignore evidence based on the fact that that evidence was not enough to clearly and convincingly overturn a fact that was found by the court. Now, getting to your point of materiality, I think there we get to what is a determination and what's a fact, right? And so, Your Honor, I think it's clear that if the court finds a fact, such as what color was the traffic light when the car was going through it, in order to argue differently, you have to show clear and convincing evidence. But if the court is going to make determinations based on those facts, you don't have to rebut under Section E1 for all of the facts to be considered in determining whether that determination was reasonable. And I believe that's the teaching of Pye. I understand the general argument that you're making, but can you point me to any page in line in the district court's order that actually states the requirement that you're saying it implemented? Your Honor, I can't point you to a specific page in line as much as I can say that if you look at what the district court did, for example, in looking and considering the evidence that demonstrates that trial counsel was aware fully two years before the trial about the need for additional expert testimony, both testimony of witnesses but contemporaneous evidence. Dr. Wileman's notes from a meeting, the emails that were exchanged with Dale Davis, the court considers that evidence only as contradictory evidence under an E1 analysis and never stops and includes that analysis in a D2 reasonableness analysis. And that's the error. What the court did was the court made the D2 determination dependent on the predicate of first finding by clear and convincing evidence that a fact could be rebutted under E1. But did it say that it was doing that or you just get the feel that it was doing that? Neither, Your Honor. It did not say that it was doing it, but I think there's certainly not a sentence to point to. But if you look through the opinion and you look high or low, you cannot see where the district court engaged with that evidence in performing a D2 analysis. Now, part of that is understandable because that evidence wasn't considered by the state court and is mentioned nowhere in the state court's findings either. I want to know your position on why the additional expert testimony provided during the habeas process was not cumulative. What was the additional information that wasn't properly before the state court that could have had a different result in this case? Your Honor, I'd like to start with what that testimony is. You had three expert witnesses testify. First, you had Dr. Josette James testify. She performed testing, testing that was never performed by Dr. Wileman, and she reached a diagnosis, and that diagnosis was based on her testing, based on her evaluation that Mr. Stensky was functioning at an adolescent level and that his executive function limited his ability to handle a stressful situation. Similarly, Dr. Ash, a forensic psychiatrist, testified that Mr. Stensky's actions on the night in question had all the hallmarks of adolescent crime. He reached the conclusion that Mr. Stensky was acting at a 13- to 15-year-old level. And finally, Dr. Gabarino, who testified based on his lifetime of work dealing with childhood trauma, that this was one of the most severe cases of trauma and neglect and abandonment that he had seen and that, in fact, at the time of the crime, Mr. Stensky was an untreated, traumatized child. Now, you have to compare that to what Dr. Wileman testified to. Well, and you also have to compare that to the nine aggravating factors that the jury found to support the death penalty. How do you address balancing that balancing that had to have happened? The balance is that all of that testimony from those habeas experts provided the second half of the story. They explained why Mr. Stensky's culpability was reduced. It was based on the facts that were presented, but there was no expert testimony about. In and around this time, the Supreme Court decided Roper v. Simmons. Looking at scientific data, looking at scientific information, the Supreme Court concluded that it would be unconstitutional to apply the death penalty to an adolescent because they did not have the requisite culpability. Well, the district court rejected your effort to apply, I guess, the T case. So, is that even before us right now? Your Honor, my point is that a juror could have heard the evidence about adolescence and could have heard the science behind the culpability of an adolescent and could have reached the same conclusion and come to the same conclusion that Mr. Stensky functioning at an adolescent level was not sufficiently culpable to warrant the death penalty, which is reserved for the worst of the worst. Was there any evidence of brain damage, whether organic or traumatic? There wasn't, right? Your Honor, there was evidence presented by Dr. James about lapses in Mr. Stensky's executive function and his ability to process information. Did she tie it specifically to brain damage from a traumatic physical event? I don't believe she did that, but the effect is the same. At the night of the crime, based on Dr. James' testimony, his executive function, his ability to process information was impaired, and that exacerbated the fact that he was functioning at an adolescent level, and all of that goes to mitigate his culpability. And to go back to your point, Your Honor, it's simply not a matter of stacking up the evidence. The evidence has to be weighed, and one of the important things in weighing the evidence is understanding, as this Court found in Farrell v. Hall, that sometimes an explanation of culpability can go a long way towards minimizing the aggravating factors. But at the sentencing phase, there was evidence that he had. I don't know if the term executive functioning was used, but there was evidence of certain functioning deficits, and it seems like now the evidence is stronger evidence of those same things. Why is my impression of that wrong in your view? Because, Your Honor, the testimony that the jury heard was Dr. Wileman testifying from the social history that was prepared by Dale Davis, and she was testifying about diagnoses that were reached at different times during Mr. Stinsky's life. And it was not, and she did not diagnose Mr. Stinsky, and none of that evidence went to specifically what was going on with Mr. Stinsky on the night of the crime. Dr. Wileman was asked specifically on cross-examination whether she was offering anything about Mr. Stinsky's criminal responsibility, and she said she was not. Everything that our three experts testified to went directly towards that issue. And, in fact, Your Honor, when you look at what the prosecutor said in closing argument, he looked at the jury and he said the experts, it ends up being a whole lot of nothing. And I'm not sure he was wrong about that. But when you look at the total of Dr. James' testimony, Dr. Ash and Dr. Gabarino, you cannot conclude that it's a whole lot of nothing. It's scientific-based testimony demonstrating that Mr. Stinsky's culpability should be reduced as of the night of the crime because he was functioning at an adolescent level. So just to be clear, you're saying at the penalty phase, to your view, there, well, let me say this. It seems like there are two issues or pieces of information. One, that Mr. Stinsky had a very troubled, challenging, traumatic perhaps childhood. And number two, that he was immature for his age at the time of the crime. But then you also have his activities after the crime. What additional information, and maybe you've answered this and I'm just not understanding it, did the jury not hear in terms of Mr. Stinsky's background? Your Honor, the jury got a fulsome presentation on Mr. Stinsky's background. Over 20 witnesses testified, the overwhelming majority of them fact witnesses. Your Honor, that was only half the story because that testimony didn't explain in any way how those facts could translate into less culpability for this defendant on the night of the crime. And yes, the jury heard anecdotal evidence from Dr. Wileman and from others that he seemed immature, that he seemed young for his age. But contrast that with three professionals who examined and diagnosed him as functioning at an adolescent level. There's a quantum difference between that evidence, and that quantum difference is what was necessary to provide a basis for a juror to conclude, for example, that it would be improper to apply the death penalty to someone who was functionally an adolescent. Well, that's certainly, the Supreme Court has not said you can't apply the death penalty to someone who is functionally an adolescent, right? Yes. And I find it hard to believe, frankly, that any juror would conclude that this type of behavior would be unsurprising from an adolescent. I mean, we don't need to go through the facts of the crime, but they're horrific. I don't think that functioning at the level of an adolescent is the sort of thing that would be at all likely to change anyone's mind under the facts of these cases, of this case. Your Honor, that goes to Dr. Ashe's testimony, which was Dr. Ashe testified and could have testified to the jury that the number one indicator of violence in an adult at a crime is a prior history of violence. There was no prior history of violence with Mr. Stinsky. And that's part of why Dr. Ashe concluded that Mr. Stinsky's participation on the night in question had all of the hallmarks of adolescent crime, had all of the hallmarks of an adolescent participating in a situation where he lacked the skills and the ability to extricate himself from. Let me ask, let me sort of put a little bit more of a point on it, because the problem for us also is that this arises in the EDPA context. So it's not even as though, you know, we are deciding in the first instance how we would decide, you know, what we would think. Although I do agree these are probably the most egregious facts that I have seen. That said, there's one step beyond that, which is that this was an unreasonable decision. I wonder if you could speak a little bit, and I know you've been speaking generally to it, but if you had to sort of specify what makes this unreasonable under the EDPA standard as opposed to, and I, you know, I hate to say just wrong, but that is what the Supreme Court has told us, that just wrong is not enough, what makes it an unreasonable decision by the state court? On the prejudice point, the unreasonableness is the state court found that the evidence was compelling and persuasive, and compelling and persuasive evidence cannot be cumulative. And to have framed all of this evidence from these three habeas experts as cumulative, that is unreasonable, and that's what gets you over the EDPA deference standard, is because there is no reasonable way to look at what those experts testified to, the scientific basis that that testimony was based on, the cognitive testing that was done of the defendant, and to say that that is cumulative to the anecdotal observations that Dr. Weilman made, that in her eyes he seemed young for his age or he seemed immature, that is unreasonable. On the question of the first question, the deficiency prong, Your Honor, is the state court did not engage with any of the evidence, the contemporaneous evidence demonstrating that trial counsel was on notice that additional experts would be necessary. And it was unreasonable to determine that the trial counsel could nonetheless simply rely on a finding made years later by Dr. Weilman, when two years earlier they were put on notice specifically about the need for those expert witnesses. And to that end, Your Honor, the state court's fact finding implies the counsel made a strategic decision not to employ additional experts. There is zero evidence in the record to that effect. The evidence in the record demonstrates that not retaining and presenting additional experts was the product of neglect. There's nothing to demonstrate that counsel sat down and said, well, Dr. Weilman's not recommending another expert, so we're going to make a strategic decision not to have any additional experts. And again, Your Honor, that's what gets across the AEDPA deference point, because at the end of the day, the decision not to retain additional experts was based on neglect. And the reason we know that is we have Dr. Weilman's notes from January 2005. We have Dale Davis's emails from 2004, both fully two years before the trial, suggesting that additional experts are needed. Dr. Weilman even proposing who that expert might be, and that's in addition to Ms. Davis's testimony saying that she raised this point time after time with trial counsel. Well, how do you reconcile that with what the courts have said, which is that a defense attorney needs to provide due diligence and, of course, zealously represent their client, but they don't have to be exhaustive in terms of all of the means or tools that they use. So how do you reconcile that with perhaps a recommendation that more experts be retained, as opposed to the multiple witnesses that were presented at the penalty phase? Your Honor, the distinction is in the importance of the evidence. This is not a mitigation specialist who interviewed 15 witnesses, for example, saying you ought to go out, fact witnesses, and say you ought to go out and interview 10 more. This is a recommendation to get the most important evidence for mitigation. Let's be clear. Mr. Stensky was 18 years and 9 months old the night of the crime. He confessed to the crime. Counsel, from their very first interactions, knew that he acted in an immature way. Mr. Yancey said he acted like he was a kid. They were receiving reports from Ms. Davis indicating that there was tremendous trauma and tremendous issues of abandonment, and what was necessary was some way to connect that and to show how the facts that counsel did investigate manifested themselves in an 18-year-old boy on the night of the crime such that he was functioning as an adolescent level. So it is not a question of whether what they did is adequate in not needing to be exhaustive. It's the fact that they neglected to pursue not some additional evidence but the most important evidence for mitigation. I still haven't heard you say why, besides saying that compelling evidence can't be cumulative, which I'm not sure is the standard, why you would meet the prejudice prong, why this evidence would overcome the aggravating, grotesque factors of this crime. And why no reasonable jurist could possibly think that they would not overcome that. Because, Your Honor, a juror could conclude that Mr. Stinsky was less culpable and not among the worst of the worst because at the night of the crime he was functioning as a 13- to 15-year-old. If they credited Dr. Asch's testimony and they said that Mr. Stinsky on the night of the crime was effectively a 13-year-old, it is not a far stretch to believe that a single juror might decide that— The single juror standard, that's not the standard that we apply. Your Honor, even so, it meets the standard to say that if Dr. Asch's testimony was credited and if one believes that Mr. Stinsky was functioning as a 13- to 15-year-old, that his culpability was mitigated and it could overcome the aggravating factors. I see my time has expired. I'm happy to continue if there's anything else. Well, thank you very much, Mr. Fuse. You have reserved five minutes for rebuttal. Thank you, Your Honor. Is it Mr. Petrani? Petrani, Your Honor. Petrani. Thank you. May it please the Court. This case is about a question that the Court already resolved in PI. The District Court granted the COA before PI was decided. I find it hard to believe the District Court could have after PI. In fact, the District Court's order granting the COA identifies some of the uncertainty and some of the potential disagreements among courts of appeals that PI resolved. One thing that I want to push back very strongly on is the idea that the District Court applied this standard where you must find some E-1 fact to be unreasonable or overcome the presumption in order to get to D-2. The District Court never said that. In fact, as far as I can tell, and I've read the order several times, the District Court only applied E-1 once. It only applied it to the question whether or not Dr. Weilandman told counsel that they needed to do more testing or hire more experts. Other than that, everything in the order that's relevant here is clearly under D-2, and the District Court uses D-2 language. It was not unreasonable to determine. It was not unreasonable to determine. The only time that the District Court applies E-1 is with that one particular fact finding, which means that in addition to the fact that this case has already been decided in a lot of ways, even if there was something left to be determined about the interplay between D-2 and E-1, it doesn't really affect this case. On prejudice alone, I don't believe that Petitioner has even identified an area where he thinks that E-1 was somehow improperly applied or that D-2 was not really the standard to be applied. And so there's nothing left to decide at that point. You know, I am, of course, happy to answer any of this Court's questions about any of the other issues as well, but as far as we can tell, this case just begins and ends with, I resolved this question and there's nothing left for this Court to really do. All right, so for purposes of this question, just assume we get past that first question. In this case, it's true that Mr. Stinsky was 18 years old at the time that this crime occurred, and if he had been just, you know, nine months younger, the death penalty wouldn't have been an option, right? I mean, that seems, especially when we're talking about his adolescent tendencies, that is a little troubling. I mean, frankly, that by nine months, because of, you know, a nine-month difference in his age, he is now subject to the death penalty when he otherwise wouldn't have been. And so, you know, I guess perhaps that could be an issue that might cause, you know, that might cause people to think, well, this needs to be reweighed, because it's just such a powerful, it really is, I think it's a powerful mitigating factor, you know, in terms of he missed the cutoff by nine months, and he was really kind of juvenile in his sort of mental abilities at the time. Yeah, so, Your Honor, a few points on that. The first being, of course, the state habeas court, the district court, addressed all of this a particular way, and we don't think that that's part of the COA, but even taking it more head-on. The Roper standard, certainly people have criticized the idea that it's a direct cutoff. The Supreme Court has addressed that by saying, yeah, it's not ideal necessarily, but what else are we going to do in some sense? Like, we need, if we're going to do this, we're going to have a cutoff. It's not necessarily anymore just that the cutoff be at 18 versus 20. Right, but just to be clear, it's not really a question about whether or not the Supreme Court got the cutoff right. It's about whether if it's that kind of a mitigating factor enough that the Supreme Court rules out death penalty for under 18, that a nine-month difference, why wouldn't that be a powerful mitigating factor? I think there are two separate questions there. Of course, there's the legal question of whether they can even be subject to the death penalty, and then there's the much more factual question of, well, how does youth play into mitigation generally speaking? And there's no doubt that youth can be a factor in mitigation, but it was omnipresent in this case. I mean, from actually the guilt phase on, the entire strategy was to make clear that Well, on the immaturity piece, if I understand opposing counsel's presentation, the argument is that it's one thing for an expert at the penalty phase to say this person is immature, as opposed to the more extensive, detailed, fact-based investigation at the habeas stage that the expert presented as to how Mr. Stinstein was immature, why he was immature, and how that immaturity played itself out. Do you agree that those are very different pieces of evidence that, if the jury had been exposed to, would have been relevant? I think the jury was exposed to all of that evidence, Your Honor, but I also think that this Court has held explicitly in Holsey and Herring that just getting a scientific gloss on what is effectively the same sort of evidence is not enough to establish prejudice. So in those two cases, the petitioner had testimony from relatives, a mother in one case, and I believe a sister in the other, saying that he was low IQ and had trouble in school, things along those lines, and then there was no expert testimony as to that. And then on habeas, he argued that, well, if I'd had expert testimony on that, that would have been a fundamentally different thing because it's scientific evidence. It's not just the opinion of the mother or a close relative. And the Court in both cases said, no, that's still essentially cumulative evidence. It's the same type of evidence. Yes, it has an expert behind it now, but that does not fundamentally change it. But I'd also add there was an expert in this case. Dr. Wilenman did testify about pretty much everything that Stensky now says his three new experts would testify about. I think the only thing that arguably would have been slightly different is that one of the experts, James, performed this neuropsychological exam, but the results of that exam just lined up with everything that Dr. Wilenman told the jury, which was, and to answer your question from earlier, Judge Grant, Dr. Wilenman did testify that there were deficits in executive functioning and, in fact, explained that this is common with ADHD and that as one grows, a lot of the times those deficits can diminish so that someone who's 24 or 25 might have better executive functioning than someone who is 17 or 18. Dr. Wilenman also noted that everyone that she talked to said he's immature. She found him to be immature. In closing argument, counsel asserted that because Kelly was so manipulative, like Charles Manson and so on and so forth, what was this manipulable, kind of immature Stensky going to do? Well, of course, he was just going to follow. This was the whole strategy, and to try to relitigate it a decade later with whole new experts is really not what habeas is for. But even to the extent there were any doubt about that, we're talking about on deficiency effectively double deference and on prejudice deference to a state court decision that decided all of these things. And so whether or not you agree with every kind of iota of what the state habeas court happened to determine, I don't think there's anything in there, and I respectfully did not hear anything from counsel for Stensky that was beyond reasonability. As the district court itself noted, you could have a disagreement of fact over, for instance, whether or not Dr. Weiland did say you need new experts. I think that the evidence actually strongly suggests she never did say this. But at the very least, there is evidence on both sides. There's nothing convincing on either side. And so for the state habeas court to find Dr. Weiland did not say that and then rely on that is well within the bounds of the deference that this court grants to state habeas review. And again, none of this, I don't think any of this is within the COA, and I also don't think it would matter. No matter how you analyze these questions under E1 or D2, there's nothing that the state habeas court did that was unreasonable or overcome by clear and convincing evidence that's relevant in this particular case. Of course, I continue to be happy to answer any other questions, but we really do believe that this is just pie redux in a lot of ways, at least on this issue. I do not believe the district court would have granted this COA post pie. And if there are no further questions, I will sit down. Thank you, counsel. Thank you, Your Honors, and once again may it please the court. The certificate of appealability on the last page, page 35, says the court grants petitioner's certificate of appealability on the issue of whether the court properly applied sections 2254D2 and 2254DT of AEDPA in the habeas order evaluating petitioner's ineffective assistance to counsel claim. I think that that properly brings before the court whether the court properly applied the D2 standard. Counsel made reference to Dr. Wileman and testifying that she was an expert and that she testified to essentially the same things as the habeas experts testified to. The only way you can believe that is if you ignore her testimony. You have to ignore her testimony that when confronted on cross-examination and asked, did you perform any tests, she said no. Did you reach any diagnosis? No. Are you doing a social history? Yes, that's all I'm doing. And then finally, and most significantly, are you testifying about Mr. Stinsky's criminal responsibility? No, I am not. That does not render her functionally equivalent to the habeas experts' testimony. Now, in speaking of the AEDPA deference, Your Honor, what Dr. Wileman may or may not have told counsel about the need for additional experts is different than whether counsel was on notice of the need for additional experts. We are not relying solely on Dr. Wileman. We believe the better evidence from Dr. Wileman is, in fact, that she did recommend additional experts. In fact, she identified who those additional experts would be fully two years before trial, but there's other evidence. There's the e-mails exchanged between Mr. Sparger and Dale Davis, and there's Dale Davis' testimony. But why does your disagreement with the district court's conclusion mean that it implemented D-2 incorrectly? Your Honor, because it treated whether Dr. Wileman made that statement to counsel or not under E-1 as dispositive under D-2. I think I asked before and I didn't get an answer. Where can you tell me where the court said it was treating it as dispositive? I read the court as discussing a lot of the evidence that you've just mentioned and just coming to a different conclusion than you did. Your Honor, because when it's discussing that evidence, evidence that was not discussed by the state court, it only discusses that evidence in the context of whether or not that evidence was sufficient to overcome the clearing convincing burden under E-1 and does not discuss it in the context of D-2. Unless there are any further questions, that's my presentation. Thank you, counsel. We'll take it under advisement. We'll be in recess. All rise. Thank you, counsel.